**TRANSAMERICA AIRLINES, INC., Petitioner,**

**v.**

**CIVIL AERONAUTICS BOARD, Respondent,**

**Davis Agency, Inc., Pan American World Airways, Inc., Texas International Airlines, Inc., Intervenors.**

**No. 80–1266.**

United States Court of Appeals, District of Columbia Circuit.

Argued 23 Feb. 1981.

Decided 24 Aug. 1981.

Jeffrey A. Manley, Washington, D. C., for petitioner.

Thomas L. Ray, Atty., I. C. C., Washington, D. C., with whom Sanford M. Litvack, Asst. Atty. Gen., Dept. of Justice, Michael Schopf, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, I. C. C., Robert R. Nicholson and Daniel J. Conway, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent.

Mark Pestronk, Washington, D. C., was on the brief, for intervenor Davis Agency, Inc.

James M. Verner and Russell E. Pommer, Washington, D. C., were on the brief, for intervenor Pan American World Airways, Inc.

Emory N. Ellis, Jr., Washington, D. C., entered an appearance, for intervenor. Texas International Airlines, Inc.

Before WILKEY and MIKVA, Circuit Judges, and GORDON,* United States Sen-

ior District Judge for the District of Kentucky.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Transamerica Airlines has petitioned for review of a series of orders by the Civil Aeronautics Board (CAB or the Board) authorizing certain air carriers to sell blocks of seats on regularly scheduled flights to contractors for resale to passengers. Petitioner's main contention is that these "group contractor fares" are prohibited under section 401(n)(1) of the Airline Deregulation Act of 1978.[1] Petitioner also charges that the Board committed several violations of the Administrative Procedure Act.[2] We find that the Board acted within its authority in approving the fares and that its decision was reached in accordance with the APA. We affirm the Board's orders in all respects.

## I. BACKGROUND

### A. The Distinction Between Charter Carriers and Scheduled Carriers

Congress has authorized the CAB to issue certificates for two basic kinds of passenger carriers: scheduled carriers and charter (or supplemental) carriers. Scheduled carriers provide regularly scheduled passenger service, such that all flights are operated regardless whether tickets have been sold for the full capacity of the plane.[3] Charter carriers, in contrast, attempt to run all flights at full capacity, either by arranging for one group to use the entire plane or by arranging for several different charter groups to share the plane ("split charters").[4] This enables charter carriers to offer lower fares than most scheduled carriers. Most charter flights are arranged by charter brokers, middlemen who bring groups and car-

---

*Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 49 U.S.C.A. § 1371(n)(1) (West Supp. 1981) (as amended).

2. 5 U.S.C. §§ 551–559 (1976).

3. Scheduled carriers are certificated under 49 U.S.C.A. § 1371(d)(1) (West Supp. 1981).

4. Charter carriers are certificated under *id.* § 1371(d)(3).

riers together. The Board regulates these brokers as "indirect air carriers," [5] requiring adherence to certain consumer protection regulations.[6] Carriers are not precluded from offering both services. Certification for scheduled service also authorizes the carrier to provide charter service on its own routes and on certain other routes.[7] Similarly, charter carriers may obtain scheduled authority, as Transamerica has done.[8]

Congress has left it to the CAB to distinguish between charter and scheduled service. The Board's central requirement has been that carrier services be offered on a planeload basis. CAB regulations have long prohibited carriers from running a "part charter," whereby a group paying charter fares would be transported on regularly scheduled flights.[9]

## B. *The Airline Deregulation Acts*

In the Airline Deregulation Act of 1978 [10] Congress provided for the progressive deregulation of the domestic airline industry, to culminate in abolition of the CAB itself at the end of 1984. In the interim the Board's authority to regulate such things as passenger fares and new entry has been sharply constrained. These procompetitive policies were extended to international air transportation by the International Air Transportation Competition Act of 1979.[11]

These deregulation statutes ended the status of charter carriers as "supplemental" to scheduled carriers, thus freeing charter carriers to complete directly with carriers providing regularly scheduled service. The "part charter" prohibition, however, was *temporarily* continued:

> [N]o air carrier ... shall commingle, on the same flight, passengers being transported in interstate, overseas, or foreign charter air transportation with passengers being transported in scheduled interstate, overseas, or foreign air transportation, except that this subsection shall not apply to the carriage of passengers in air transportation under group fare tariffs.[12]

This prohibition expires on 31 December 1981.[13]

## C. *The Board's Authorization of Group Contractor Fares*

In November 1979 Pan American World Airways (Pan Am) filed tariffs with the CAB proposing to establish "group contractor fares" in the Los Angeles-London and United States-Germany markets. Under the proposal, which was meant to sell unused seats on Pan Am's transatlantic flights, a contractor would purchase seats on scheduled flights at a group contract rate, then resell the seats to the public at his own price. The contractor would agree to buy a minimum number of seats per month, which Pan Am would allocate among specific flights and dates. The risk of loss from unsold seats would fall on the contractor, whose income would come solely from the differential between the price paid by the public and the group contractor fare.

Petitioner Transamerica, which is certificated as both a charter carrier and a sched-

---

5. The Federal Aviation Act forbids air carriers to operate without certification, *id.* § 1371(a), and defines "air carrier" as "any citizen of the United States who undertakes, *whether directly or indirectly* or by a lease or any other arrangement, to engage in air transportation." *Id.* § 1301(3) (emphasis added).

6. *See* 14 C.F.R. part 380 (1981).

7. 49 U.S.C.A. § 1371(e)(6) (West Supp. 1981); *see* 14 C.F.R. part 207 (1981).

8. *See Hearings on S. 1300 Before the Subcomm. on Aviation of the Senate Comm. of Commerce, Science and Transportation*, 96th Cong., 1st Sess. 227 (1979) (listing Transamerica's scheduled route authority). Scheduled carriers certificated prior to 1 January 1977, however, cannot acquire a charter certificate, 49 U.S.C.A. § 1371(d)(3) (West Supp. 1981).

9. *See* 14 C.F.R. § 207.111 (1981).

10. Pub.L.No.95–504, 92 Stat. 1705 (codified in scattered sections of 49 U.S.C.A. §§ 1301–1552 (West Supp.1981)).

11. Pub.L.No.96–192, 94 Stat. 35 (1980) (codified in scattered sections of 49 U.S.C.A. §§ 1301–1552 (West Supp.1981)).

12. 49 U.S.C.A. § 1371(n)(1) (West Supp.1981).

13. *Id.* § 1551(a)(1)(E).

uled carrier, was the principal opponent of Pan Am's filings. Transamerica claimed that the group contractor fares were unlawful part charters and asserted that they were predatory and discriminatory and constituted unfair competition for charter carriers. It asked the Board to reject the tariffs or at least investigate them.

In January 1980 the CAB initially rejected the tariffs because they were ambiguous as to "precisely what the relationship between passenger and carrier would be." [14] At the same time, however, the Board rejected Transamerica's claim that the proposed fares were discriminatory or predatory. Moreover, the Board found significant differences between traditional charter services and Pan Am's proposed group contractor fares. It determined that Pan Am's fares "would not be part charters" as long as they "envisage the contractor as a mere marketer, with the carriers themselves legally responsible for the passenger's transportation in their scheduled service under the terms and conditions generally applicable to scheduled service." [15] The Board left the proceeding open for the possible filing of revised tariffs.

Eleven days later Pan Am filed revised group contractor fare tariffs. Once again the Board rejected Transamerica's contentions that the new fares constituted unlawful part charters and discriminated against charter service. Although conceding that Pan Am might gain a competitive advantage from the new fares, the Board noted that they would not provide any greater threat than other low scheduled fares already authorized. [16] The Board also conced-ed that charter operators could be disadvantaged because they, unlike group contractors, were subject to CAB consumer protection regulations, but found it sufficient that this issue was already being examined by the Board in a different rulemaking proceeding. [17]

Pan Am's proposal was approved in general, [18] and group contractors were exempted from tariff requirements. This grant of exemption authority was conditioned "on the undertaking of both carriers and contractors to ensure that consumers receive clear and conspicuous notice of the differences between the contract rights and obligations of the bulk fare passenger and those of the carrier's ordinary coach or economy fare passenger." [19] In March 1980 the Board approved similar fares proposed by American Airlines and Braniff Airways, once again over the objections of Transamerica. [20] Petitioner brought this action seeking to overturn the Board's actions in each of the three cases.

## II. ANALYSIS

Petitioner finds fault with the Board's orders on each basic ground of administrative law. First, it claims that the Board's decision was unauthorized because the group contractor fares are illegal part charters. Second, it alleges that the Board's decision not to impose consumer protection requirements on group contractor fares discriminates against charter carriers, constituting arbitrary and capricious action in violation of the APA. Third, it claims that

14. CAB Order 80-1-72, at 6 (11 Jan. 1980), *reprinted in* Joint Appendix (J.A.) at 6.

15. *Id.* at 5-6, *reprinted in* J.A. at 5-6.

16. CAB Order 80-2-112, at 8 (21 Feb. 1980), *reprinted in* J.A. at 17. The Board also observed that Transamerica had scheduled authority in the United States-Germany market and thus could respond competitively to Pan Am's new fares. *Id.*

17. *Id.*

18. Final approval was temporarily withheld because of remaining ambiguities in the proposal, *see id.* at 9, *reprinted in* J.A. at 18, but revised

tariffs were quickly filed, approved, and upheld over Transamerica's objections. *See* CAB Order 80-7-36 (8 July 1980), *reprinted in* J.A. at 40.

19. CAB Order 80-2-112, at 10 (21 Feb. 1980), *reprinted in* J.A. at 19.

20. *See* CAB Order 80-3-58 (12 Mar. 1980), *reprinted in* J.A. at 26; CAB Order 80-3-175 (26 Mar. 1980), *reprinted in* J.A. at 34. The Board also approved several other group contractor proposals not at issue here.

the Board's decision was not supported by substantial evidence. Finally, it contends that the Board committed procedural errors in dismissing its complaint without a hearing and in conducting *ex parte* communications with certain scheduled carriers. For the reasons set forth below, we affirm the Board's orders.

### A. The Board Acted Within Its Authority In Approving the Group Contractor Fares

Transamerica raises two basic challenges to the CAB's construction of section 401(n)(1), both of which argue that the central difference between charter and scheduled services is whether the fares are marketed by an *indirect* air carrier or a *direct* air carrier. First, it contends that this direct-indirect distinction has been at the heart of the Board's interpretation of the difference between charter and scheduled service and that the Board may not adopt a different interpretation without a hearing. Second, whatever the Board's prior interpretations, Transamerica contends that the old distinction has been supplanted by a new one—"that between charter services and scheduled 'group fares' "[21]—which emphasizes the presence of direct or indirect carriers. For support it points to a passage in the conference report that accompanied the International Air Transportation Competition Act:

> While the part charter prohibition does not expressly refer to the carriage of passengers under group fare tariffs, the Board must be vigilant in distinguishing proposals filed under the guise of group fare tariffs but which are tantamount to part charters, especially where marketing is by an indirect air carrier rather than by the air carrier directly or through an appointed agent.[22]

In Transamerica's view, "Congress by enacting § 401(n)(1) completely reversed the focus of the prior charter/scheduled distinction and narrowed the Board's scope of discretion."[23]

The Board denies that it has redefined the meaning of "charter," arguing that the direct-indirect distinction was never crucial to its definition of charter services. It admits that "[t]he presence of . . . middlemen, which Board precedent clearly identifies as indirect carriers, are [sic] characteristic of the charter concept."[24] But it finds more important the fact that charter operators have "always performed more than a marketing function, i. e., the mere sale of space on a carrier's plane."[25] The charter operator is responsible for the provision of transportation and it, rather than the charter carrier, is liable to passengers for failure to perform the transportation contract. In contrast the group contractor is "a mere marketer, with the carriers themselves legally responsible for the passenger's transportation in their scheduled service under the terms and conditions generally applicable to scheduled service."[26] The carrier, along with the contractor, is responsible for ensuring that passengers receive air transportation or a full refund. Thus "[t]he real difference between the proposed group contractor program and charter service is . . . that a special relationship exists between the airline and the passenger."[27] The Board also noted the Pan Am's new fares were quite similar to scheduled group fares approved in 1970, the contract bulk inclusive tour fares (CBIT's).[28]

 Congress has never set forth the distinction between charter and scheduled

---

**21.** Brief for Petitioner at 22.

**22.** H.R.Rep.No.716, 96th Cong., 1st Sess. 23 (1979).

**23.** Reply Brief for Petitioner at 5.

**24.** CAB Order 80–1–72, at 5 (11 Jan. 1980), *reprinted in* J.A. at 5.

**25.** *Id.*

**26.** *Id.* at 5–6, *reprinted in* J.A. at 5–6.

**27.** CAB Order 80–2–112, at 7 (21 Feb. 1980), *reprinted in* J.A. at 16.

**28.** *See IATA Agreements Relating to Transatlantic Fares*, 53 C.A.B. 266 (1970), *aff'd sub nom. National Air Carrier Ass'n v. CAB*, 442 F.2d 862 (D.C.Cir.1971).

services, instead using "charter" as "a flexible term which the CAB is free to define in accordance with experience and changing circumstances as long as the integrity of scheduled service traffic is not vitiated."[29] We think the part charter prohibition in section 401(n)(1) was intended to maintain Board discretion.[30] This is an interim measure to be followed during a period of rapid deregulation, and we cannot assume that Congress meant to go beyond the existing regulations. Had Congress intended to equate indirect carriers with charter operators, it easily could have done so in express terms. Instead it simply left the decision, as before, with the Board.

█ In light of this background we cannot say the Board's determination was unreasonable or unlawful. The prior approval of CBIT's rebuts Transamerica's contention that the Board's prior and consistent interpretation of charter services has been to equate them with the presence of indirect air carriers. The differences the Board has identified between group contractor fares and charter services—primarily the difference in carrier liability to the passenger— are substantial enough to support its determination. Adherence to the present definition will, in the short period section 401(n)(1) will remain applicable, prevent the collapse of the charter services-scheduled services distinction. This is all Congress has demanded.

## B. *The Board's Orders Were Not Arbitrary or Capricious*

Charter operators are subject to consumer protection regulations, such as bonding requirements, escrowing of deposits, and consumer notice and refund requirements, that are inapplicable to scheduled services and thus to group contractor fares.[31]

Transamerica claims that the Board's refusal to apply these regulations to the group contractor fares is irrational and will damage charter carriers by enabling group contractors to market their fares at a lower cost.

The Board rejected this discrimination argument on several grounds. It noted that Transamerica, like most charter carriers, is certificated to provide scheduled service in many markets and thus may adopt its own version of the group contractor fares. More important, it found that the principal justification for the imposition of consumer protection requirements on charter operators, the limited responsibility of the carrier to the passenger, was lacking in the case of group contractor fares because the scheduled carrier is responsible for ensuring that the passenger receives his transportation or a refund.[32] The Board acknowledged that charter operators might suffer some disadvantage relative to group contractors because of the necessity of complying with the Board's consumer protection regulations. But it determined that this issue did not bear on the validity of the tariff proposals, but rather "raises the larger question of whether the Board should impose consumer protection regulations on charter operations without imposing similar requirements on scheduled service tours."[33] The issue of regulation of scheduled service tours was already the subject of a separate comprehensive rulemaking proceeding, which the Board determined was "far better suited to consideration of these issues than proceedings involving individual scheduled service tariff proposals."[34]

█ We find that the Board properly rejected Transamerica's claims of discriminatory treatment. The Board's finding that the group contractor fares were scheduled

29. *Trans World Airlines, Inc. v. CAB*, 545 F.2d 771, 774 (2d Cir. 1976).

30. *See* S.Rep.No.631, 95th Cong., 2d Sess. 98 (1978) ("This section is designed to preserve the distinctions between charter and scheduled air transportation").

31. *See* 14 C.F.R. part 380 (1981).

32. *See* CAB Order 80–2–112, at 6–8 (21 Feb. 1980), *reprinted in* J.A. at 15–17.

33. *Id.* at 8, *reprinted in* J.A. at 17.

34. *Id.; see* Advance Notice of Proposed Rulemaking, SPDR–71, 44 Fed.Reg. 43,481 (25 July 1979).

rather than charter services provides ample justification for its refusal to apply the charter consumer protection regulations to these fares. Like the Board we see nothing in the record to convince us that approval of these particular fares will, in the rapidly changing climate of deregulation, destroy the competitive position of charter carriers. And the possibility that Transamerica will suffer some competitive harm, which the Board has forthrightly acknowledged, does not invalidate the group contractor fares. The Board is simply not required to equalize the competitiveness of all forms of passenger air service; on the contrary Congress has instructed the Board to facilitate free and open competition, which was done here in approving these new and innovative fares. Moreover, the Board has taken steps to investigate whether consumer protection requirements should be imposed as well on scheduled service tours. The pending rulemaking on this issue shows that the Board is not acting irrationally but is rather attempting to adjust the various forms of passenger service to maximize the welfare of the traveling public.[35]

## C. The Board's Findings Were Adequate to Support Its Orders

[4] Transamerica seeks a remand to the CAB on the ground that the orders were not supported by "substantial evidence" as required by the Federal Aviation Act.[36] This claim has no merit. Transamerica ignores the fact that the CAB decision was based almost entirely on legal and policy interpretations. Few facts needed to be found. In determining that section 401(n)(1) did not apply the Board needed only to compare the proposed new fares

with existing forms of charter and scheduled services. On the competitive harm issue the Board was able to take note of the basic facts that were relevant—that group contractor fares would be roughly the same as other discount fares and that Transamerica could employ the new fares itself on its scheduled routes. Thus, regardless whether the findings are properly categorized as "predictive judgments," [37] the approval orders had sufficient evidentiary support.

## D. The Board Did Not Commit Procedural Errors In Approving the Tariffs

### 1. Petitioner received adequate opportunity to oppose the tariff filings.

Transamerica raises several objections to the Board's refusal to hold a hearing in this case. It maintains that a hearing was warranted because it offered evidence sufficient to provide a basis for further investigation of the proposed tariffs and because the Board's grant of an exemption to all indirect air carriers selling group contractor services was quasi-adjudicatory in nature. More generally it contends that the Board established a general rule of applicability governing group contractor fares and that such a rule can be adopted only after a notice and comment proceeding under the APA.

We find the Board's procedures adequate. The Board may dismiss a complaint without hearing whenever it finds the complaint "does not state facts which warrant an investigation or action." [38] Similarly, it may act upon exemption requests without

---

**35.** Petitioner relies on *United Air Lines, Inc. v. CAB*, 569 F.2d 640 (D.C.Cir.1977), in which this court stated that "the Board must justify its distinction between the class of carriers to which it has applied ... restrictions and those to which it has not." *Id.* at 653. The short answer is that the CAB *has* justified its distinction. Charter carriers, unlike scheduled carriers, are not liable for failure to provide transportation, and the Board has responded by imposing consumer protection regulations on charter operators. *See* CAB Order 80–1–72, at 5 (11 Jan. 1980), *reprinted in* J.A. at 5.

**36.** 49 U.S.C. § 1486(e) (1976).

**37.** *Compare* Brief for Respondent at 45 *with* Reply Brief for Petitioner at 31–32. *See generally National Small Shipments Traffic Conference, Inc. v. CAB*, 618 F.2d 819, 829–30 (D.C. Cir.1980) (complete factual support not required for predictive judgments).

**38.** 49 U.S.C. § 1482(a) (1976).

holding a hearing.[39] We find nothing in the record to convince us that Transamerica's complaint deserved a hearing, especially since the Board's decision was primarily a legal and policy interpretation. Moreover, Transamerica was given adequate notice of the proposals and sufficient opportunity to make its objections known to the Board; indeed, the Board's orders consist largely of rebuttal to Transamerica's many complaints. The Board did not err in approving the tariffs and granting the exemptions without conducting an oral hearing.[40]

2. *The* ex parte *contacts were not improper.*

Transamerica complains that the Board's final orders were "tainted" by ex parte communications among the Board's staff, Pan Am, and intervenor Davis Agency, Inc. On 11 January 1980 the Board authorized the parties to contact the Board's Bureau of Consumer Protection to discuss the form of notice to be provided to consumers buying tickets from group contractors. Proposed forms of notice were drafted by Pan Am and Davis together and by the Board's staff. On 21 January 1980 attorneys for Pan Am and Davis met with staff members of the Bureau of Consumer Protection at the Board's offices. The proposals were exchanged and discussed. The Board subsequently determined not to approve notices on an individual basis, instead setting forth its own requirements.[41]

Transamerica maintains that, contrary to the Board's position that these discussions were not substantive communications that related to any significant issue in the proceeding, it was seriously damaged by this procedure because of "the competitive impact that would result if less rigid consumer protection regulations were imposed on indirect air carriers acting as contractors than on the same marketers acting as charter operators."[42] This objection is unfounded. The Board did not reach any new decision concerning consumer protection regulations but determined only that group contractor fares were scheduled services to which the charter consumer protection regulations did not apply. The discussions on the form of the notice were unrelated to the Board's central determination that group contractor fares are not part charters. In any event the Board held no hearing and none was required. The prohibition on ex parte communications did not apply.

## III. CONCLUSION

The CAB has been given the difficult task of ending a long reign of strict regulation and instituting a return to competition in the airline industry. At the same time Congress has instructed the Board to con-

---

**39.** 14 C.F.R. § 302.408 (1981); *see, e. g., American Airlines v. CAB*, 231 F.2d 483, 487–88 (D.C. Cir.1956).

**40.** Petitioner makes the additional claim that the Board, in summarily rejecting Pan Am's initial tariffs, erred in specifying the problems it found in the proposals. It cites *Delta Air Lines, Inc. v. CAB*, 543 F.2d 247 (D.C.Cir.1976), in which this court struck down CAB orders because "*the Board was attempting to determine and prescribe the rules and regulations applicable to hazardous cargo, without notice and hearing, i. e.,* the Board was telling the carriers exactly what rules and regulations to include in their tariffs." *Id.* at 267. (Emphasis in original.) It seems a bit odd for Transamerica to be asserting that Pan Am was damaged by the rejection order, when Pan Am seems quite content with the ultimate outcome. Fur-

thermore, petitioner's reliance on *Delta Air Lines* is misplaced. The intent of that decision was to prevent the Board from taking the "improper short cut" of imposing rules and regulations by rejecting every tariff that does not conform with them, *id.,* not to require the absurd result of unexplained Board decisions. Here the Board did not seek to compel adoption of specific regulations. It expressed its general agreement with the group contractor fare concept but found several ambiguities in the proposal itself. Explaining the basis of its rejection was not erroneous but rather sound administrative practice.

**41.** *See* CAB Order 80–2–112, at 10 (21 Feb. 1980), *reprinted in* J.A. at 19.

**42.** Brief for Petitioner at 60.

tinue on a temporary basis the existing distinction between charter and scheduled services. In approving the group contractor fare tariffs the Board has adhered to both mandates, and its decision accordingly is

*Affirmed.*