784 F.2d 1118
 251 U.S.App.D.C. 314
 ARROW AIR, INC., Petitioner,
v.
Elizabeth Hanford DOLE, Secretary of Transportation, Respondent,
Professional Association Travel Services, Inc., Rich
International Airways, Inc., Spantax, S.A., and
United Airlines, Inc., Intervenors.
 No. 84-1438.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 24, 1985.
Decided Feb. 28, 1986.
As Amended April 30, 1986.
 
 O.D. Ozment, with whom Lawrence D. Wasko, Washington, D.C., was on the brief, for petitioner.
 Alice Owens, Atty., Dept. of Transp., Washington, D.C., of the Bar of the Supreme Court of Alabama, pro hac vice, by special leave of Court, with whom J. Paul McGrath, Asst. Atty. Gen., Catherine G. O'Sullivan and Edward T. Hand, Attys. Dept. of Justice, Kenneth N. Weinstein, Deputy Asst. Gen. Counsel and Robert D. Young, Atty., Dept. of Trans. Washington, D.C., were on brief for respondent. Thomas L. Ray, Atty., Dept. of Trans., Washington, D.C., also entered an appearance for respondent.
 
 
 1
 Howard S. Boros, Gary B. Garofalo and Aaron A. Goerlich, Washington, D.C., were on brief for intervenors, Rich Intern. Airways, Inc. and Spantax S.A.
 
 
 2
 Kenneth Berlin, Washington, D.C., was on brief intervenor, United Airlines, Inc. John R. Keys, Jr., Washington D.C., and Stephen P. Sawyer, Bentonville, Ark., also entered appearances for intervenor, United Airlines, Inc.
 
 
 3
 Marc A. Silverstein, Washington, D.C., was on brief, for intervenor, Professional Ass'n Travel Service, Inc.
 
 
 4
 Before WRIGHT and GINSBURG, Circuit Judges, and MARKEY,* Chief Judge, United States Court of Appeals for the Federal Circuit.
 
 
 5
 Opinion for the Court filed by Chief Judge MARKEY.
 
 MARKEY, Chief Judge:
 
 6
 Arrow Air, Inc. (Arrow) petitions for review of Civil Aeronautics Board (CAB) "Interpretation of Regulations Concerning Payment to Direct Air Carrier(s)," ER-1387 and SPR-194 (ER-1387), adopted and made effective August 17, 1984. See 49 Fed.Reg. 33,436 (Aug. 23, 1984).[1] We affirm.
 
 I. BACKGROUND
 A. The Regulatory Background
 
 7
 During the 1950s and 1960s, charter air travel was limited almost exclusively to members of "affinity groups," organizations permitted to charter aircraft for out-together back-together (pro rata) transport of their members. See EDR-348 and SPDR-64, 43 Fed.Reg. 11,215, 11,215-16 (March 17, 1978).
 
 
 8
 CAB experimented with new charter packages in the late 1960s and early 1970s, applying restrictions intended "not only to maintain a legally sufficient distinction between charter and scheduled operations, but to protect scheduled carriers from the threat of excessive diversion of traffic to the new services." Id. at 11216. Because those restrictions proved onerous, unpopular, and largely unsuccessful, CAB gradually "liberalized" its regulatory policies.
 
 
 9
 The first authorized "nonaffinity charter" (Inclusive Tour Charter) required a seven-day stay and purchase of ground accommodations. Id. The second ("Travel Group Charter"), authorized in 1972, did not require a minimum-stay. CAB continued to require seat purchases 60 days before departure and a complex pricing formula. Id. Other innovations included the "One-stop-inclusive Tour Charter" in 1975 and the "Advance Booking Charter" (air-only) in 1976. Id. at 11,217.
 
 
 10
 As part of its 1972 charter reform, CAB promulgated proposed amendments to its economic regulations. The amendments of interest here required that direct air carriers (carriers), before performing one leg of a round-trip charter, "must require full payment of the total price or the posting of a satisfactory bond for full payment." See EDR-223, 37 Fed.Reg. 5,826, 5,826 (March 21, 1972); 14 C.F.R. Secs. 207.13(b), 208.32(e), 212.10(b) and 214.14(b) (1972). CAB's stated purpose was to prevent passenger stranding:
 
 
 11
 With the increase in the number of persons traveling abroad on charter trips, there have been instances in which persons participating in U.S.-originating pro rata charter trips have found, after their arrival in a foreign country, that no provision has been made for the return flight to the United States for which the participants had already paid. This has resulted in great inconvenience and distress on the part of stranded persons, particularly since many of them are students who have relatively limited funds available.
 
 
 12
 Id. at 5826.
 
 
 13
 Payment before departure of the total cost enabled smaller and smaller groups to book together through a charter operator. Typically, passengers flew out together but returned separately.
 
 
 14
 In EDR-348, supra, the Board proposed Part 380 (enacted in SPR-149, 43 Fed.Reg. 36,604, Aug. 18, 1978), a comprehensive revision replacing several different charter forms with one simplified "Public Charter." Under Part 380, an individual could for the first time book as a group through a charter operator. For greater economic efficiency, charter organizers began contracting with carriers to fly "rotation" flights, i.e., those in which a plane flies out with one load of passengers and the next day flies back with a load of different passengers who had flown out at different times.
 
 B. Arrow Air
 
 15
 In 1983 Arrow Air contracted with Value Vacations, a Public Charter operator, to provide transatlantic flights for an extensive charter program. A prospectus, filed with CAB as required by Part 380, listed more than 600 scheduled flights from March 1984 to January 1985, and offered "MIX 'N MATCH--Select the departure and return flight of your choice--ROUNDTRIP." A Value Vacations passenger could depart New York, Boston, Baltimore, or Pittsburgh, and fly to London, Glasgow, Shannon, Paris, Rome, Milan, Palermo, Frankfurt, Munich, or Zurich, travel without a fixed itinerary, and return on any returning flight listed in the prospectus.
 
 
 16
 In mid-summer of 1984, Value Vacations told CAB that on August 10 it would cancel its "MIX 'N MATCH" program "based on a dispute between Value and Arrow regarding the payment of funds." Value reported that 3,800 passengers who had departed the United States were currently in Europe and 900 passengers who had departed Europe were currently in the United States.
 
 
 17
 Arrow then advised CAB that it would not operate any charter flights after August 10, contending that it had no duty to return passengers it had transported one-way, even though those passengers had paid for a round trip. CAB responded that Arrow was "responsible for returning those passengers, regardless of the status of Value's payments, since the Board's regulations require the direct carrier to be paid in full for both legs of a round trip charter prior to commencement of travel." See August 16, 1984 Memorandum of Legal Adviser to the Director, Civil Aeronautics Board (Joint Appendix at 2).
 
 
 18
 In that August 16 Memorandum, the Legal Advisor noted:
 
 
 19
 Arrow is well aware of this interpretation, since a similar situation involving Arrow arose in 1982. At that time, Arrow requested a waiver to cancel its program with Travex, Inc., on less than 10 days' notice since Travex could not meet its payment schedule. Acting under delegated authority, the Director of BDA [Bureau of Domestic Affairs] granted the waiver and made it clear ... that, since the carrier is required by these rules to collect in advance of the round-trip transportation of charter passengers, it is Arrow's responsibility to insure that they receive return service. Arrow did not appeal that decision.
 
 
 20
 The August 16 Memorandum advised CAB immediately to adopt proposed interpretation ER-1387 "to settle any remaining arguments on this point." It further noted that carriers had recently been exempted from certain tariff requirements so they could transport stranded passengers, an exemption that would "make it easier for Arrow to arrange lift on other carriers where necessary."C. ER-1387
 
 
 21
 On August 16, 1984, CAB issued ER-1387, 49 Fed.Reg. 33,436, captioned as an interpretation of regulations, to explain "the Board's rules regarding payment to direct air carriers for charter transportation, and the carriers' corresponding obligation to provide return transportation where it has been paid for." Id. at 33,436.
 
 
 22
 CAB noted that carriers had denied all responsibility to return passengers when a charter operator discontinued its program. It observed that carriers' contracts with charter operators did not always coincide with the charter operators' contracts with passengers. Carriers often contracted by aircraft "rotation" (out-and-back round trip on successive days), while passengers arranged for round trips spanning a longer period. Thus, a substantial danger of stranding had arisen, a condition "contrary to the intent of [CAB] rules," requiring that a carrier be pre-paid for both legs of a round-trip.
 
 
 23
 CAB also noted that the matter had been raised in a rulemaking proceeding, EDR-456, 48 Fed.Reg. 15,639 (April 12, 1983), in which CAB had proposed a major rewrite of the charter rules while retaining its prepayment rules. Commenting on EDR-456, CAB noted in ER-1387:
 
 
 24
 [T]he Board reiterated that a direct air carrier now has the responsibility to provide return transportation to charter passengers who are already on their charter trips. There would be little point to the elaborate scheme of financial protection in the present charter rules, were it otherwise. The most common danger, the Board stated, that the depository account in particular is designed to protect against is the use of one participant's funds to pay for the transportation of another--especially of one flying earlier. Such a "forward float" of participants' money poses a great danger that passengers at the end of a program, or of a high travel season, will find themselves with no transportation and no available refunds if sales do not meet the charter's expectations and the charterer defaults. The Board pointed out that it did not prohibit direct carriers and other charter operators from contracting for "rotations" as opposed to passenger round trips. However, when passenger strandings are at issue, there is no question that passengers must receive the transportation for which they have paid.
 
 
 25
 49 Fed.Reg. at 33,436.
 
 
 26
 Parties to proceeding EDR-456 had objected to the foregoing view, arguing that: (1) the prepayment rules assured safety of passengers' money when a charter operator defaulted; and (2) imposition of a duty to return would impose difficult, if not impossible, bookkeeping burdens on carriers.
 
 
 27
 In ER-1387, CAB rejected argument (1), saying that "mere protection of passengers' money is not the only question," and that passengers may be unable to purchase return transportation on short notice with the amount of their prepayment allocated to the return trip. In looking to existing regulations, CAB commented:
 
 
 28
 The point of the rules is that once the money for a round trip has passed to the direct air carrier, that carrier is deemed to have accepted the burden of transporting passengers both ways (not simply returning part of the money), regardless of the state of the relationship between the direct air carrier and the charter operator.
 
 
 29
 Id. at 33,437.
 
 
 30
 Similarly, CAB rejected argument (2), saying a passenger who pays for a round trip:
 
 
 31
 has a right to expect that both the charter operator and the performing direct air carrier have made the necessary arrangements to bring him or her home. The direct air carrier may not need to know the "itinerary of each passenger," but it should at least know enough about the number of passengers who have contracted for each return flight date to be able to provide transportation for them on those dates.
 
 
 32
 Id.
 
 
 33
 CAB said those views constituted an explanation of a continuing CAB position which "makes no change in either the letter or the intent of any Board rules." It concluded:
 
 
 34
 If the carriers choose to contract by flight rotations that have no direct relation to passengers' itineraries, they may do so, as the Board has stated--but at their own risk. They may not throw the risk of stranding onto the passenger whose money has already been paid to the direct air carrier, merely because that passenger's return trip does not fit the rotations, or because the charter operator has in some way discontinued its program.
 
 
 35
 The direct carrier can fulfill its obligation either by providing the flights itself or arranging for transportation on other carriers at no additional cost to the passengers. The transportation we expect the direct carrier to provide is from a passenger's original point of origin on the return flight to the original destination for that leg of the trip.
 
 
 36
 Id.
 
 
 37
 The accompanying staff memorandum indicates that ER-1387 was specifically applicable to Arrow.
 
 
 38
 Arrow sought immediate review on an adequate record under section 1006 of the Federal Aviation Act, 49 U.S.C. Sec. 1486 (1982). See Deutsche Lufthansa Aktiengesellschaft v. Civil Aeronautics Board, 479 F.2d 912, 915-16 (D.C.Cir.1973).
 
 II. ISSUES PRESENTED
 
 39
 1. Is ER-1387 an interpretative or substantive rule?
 
 
 40
 2. If interpretative, is ER-1387 "reasonable"?
 
 
 41
 3. Did CAB comply with relevant procedural requirements in promulgating ER-1387?
 
 III. OPINION
 
 42
 (1) Interpretative or Substantive?
 
 
 43
 Arrow says: CAB's promulgation of ER-1387 constituted substantive rulemaking and entry of an order without procedures required by 5 U.S.C. Sec. 553(b) and (c), and that, because EDR-456 (to which ER-1387 referred) involved a question of whether CAB should amend its rules to "make ... clear" a carriers' duty to return passengers, "the intent and effect of ER-1387 was, in the guise of an interpretation, to resolve the issue of 'what the rule should be' ... and to direct Arrow on a retroactive basis to comply with the new requirement." Petitioner's Brief at 23-24.[2]
 
 
 44
 This Circuit has recently discussed the "general principles" applicable in determining whether a given rule is substantive or interpretative. See, e.g., General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C.Cir.1984) (in banc). Those principles arise from a series of inquiries:
 
 
 45
 (a) does the agency appear to regard its rule as interpretive, taking into consideration the agency's own label, Chamber of Commerce v. Occupational Safety and Health Administration, 636 F.2d 464, 468 (D.C.Cir.1980), and the general language of the rule, General Motors, supra, 742 F.2d at 1565;
 
 
 46
 (b) does the rule simply state what the agency thinks the statute means, merely reminding affected parties of a pre-existing duty, Citizens to Save Spencer County v. Environmental Protection Agency, 600 F.2d 844, 876 & n. 153 (D.C.Cir.1979); Yale Broadcasting Co. v. Federal Communications Commission, 478 F.2d 594, 599-601 (D.C.Cir.1973);
 
 
 47
 (c) is the rule based on reasoned statutory interpretation, with reference to the language, purpose, and legislative history of the statute, General Motors Corp, supra, 742 F.2d at 1565;
 
 
 48
 (d) has the policy articulated in the rule "been consistently followed for a significant period of time," Esquire, Inc. v. Ringer, 591 F.2d 796, 801 (D.C.Cir.1978), cert. denied, 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979);(e) do the administrative intent and practical impact of the rule create new law, rights, or duties, American Postal Workers Union v. United States Postal Service, 707 F.2d 548, 558-59 (D.C.Cir.1983); British Caledonian Airways, Ltd. v. Civil Aeronautics Board, 584 F.2d 982, 991-92 (D.C.Cir.1978)?
 
 
 49
 To Arrow's argument that language in EDR-456 (proposed amendment "to make ... clear" that "the direct carrier shall be responsible for furnishing return transportation for any passengers who have contracted for a round trip"), 48 Fed.Reg. at 15,646, shows that ER-1387 creates a new substantive requirement, the Secretary responds that CAB had always maintained that requirement, asserting that "the Board and its staff have consistently interpreted the regulations to require advance payment for passenger round trips, and to require the air carriers to complete the transportation of passengers once it has begun the transportation." Respondent's Brief at 35.
 
 
 50
 Though the record is less than unequivocal in spots, it cannot be said on the whole record that the Secretary's assertion of a "consistently held" administrative position is not sufficiently supported. Nor can it be said, on the present record as a whole, that CAB's view of a carrier's "responsibility" as expressed in ER-1387 is a newly added element in CAB's evolving charter regulations.
 
 
 51
 The Secretary says 14 C.F.R. Secs. 207.13 and 208.32 provide the basis for asserting carrier "responsibility" because they require that carriers "shall require full payment of the total charter price, including payment for the return portion of a roundtrip." Respondent's Brief at 31. Arrow counters that in 1972, when Secs. 207.13 and 208.32 were promulgated, the principal charter form was the pro rata charter that did not involve "open returns." As shown in CAB's discussion in EDR-223, however, its concern was not limited to any particular charter form, but was directed to broad considerations of consumer protection:
 
 
 52
 With the increase in the number of persons traveling abroad on charter trips, there have been instances in which persons participating in United States-originating pro rata charter trips have found, after their arrival in a foreign country, that no provision has been made for the return flight to the U.S. for which the participants had already paid. This has resulted in great inconvenience and distress on the part of the stranded persons, particularly since many of them are students who have relatively limited funds available.
 
 
 53
 37 Fed.Reg. at 5,826.
 
 
 54
 Further, CAB stated in ER-740, 37 Fed.Reg. 11,235 (June 6, 1972), that its purpose in adopting Sec. 207.13 was to make explicit the already implicit prepayment requirement "to prevent strandings from occurring," indeed to "preclude the possibility of stranding," id. at 11236 & n. 2, a possibility CAB considered a "compelling public interest." That language, while made in the context of then-adopted Part 207, is strong evidence that CAB meant where feasible to impose a contractually based duty on the carrier to return all prepaid passengers. As clearly contemplated in the regulations, prepayment would preclude stranding because it ensured that the charter operator had paid the carrier for the traveller's return, and thus placed on the carrier a legal obligation to return the traveller at no additional cost. That protective system, inherent since at least 1972 in CAB's fundamental regulations, is precisely what ER-1387 makes explicit.
 
 
 55
 That only pro rata charters were mentioned in 1972 is not dispositive. Public Charters were not then in existence. The stranded passenger is no less stranded when travelling under a Public Charter. As reflected in the present record, the concerns addressed in 1972 remain central for later charter forms. Thus nothing in reason or law supports limitation of Sec. 207.13 et seq. to pro rata charters. Moreover, 14 C.F.R. Sec. 380.11 explicitly made those regulations applicable to the new Public Charter in 1978.
 
 
 56
 The record establishes that CAB had consistently articulated and administered the regulations of which it says ER-1387 is an interpretation. A "stranding" threat occurred in 1976. A charter operator, Dan-Air, had contracted for specific aircraft rotations with a foreign air carrier. In response to the latter's request for waiver, CAB's Bureau of Enforcement advised that "we feel [the carrier] has a clear obligation under Part 378 of the Board's Special Regulations to provide return transportation." (Joint Appendix at 65.)
 
 
 57
 Arguing that CAB once believed carriers bore no duty to return passengers, Arrow points to the discussion in EDR-348. Noting that relaxation of group travel requirements might have the "unintended consequences of jeopardizing the security of the return transportation on round-trip charter flights," CAB tentatively decided to prohibit "open returns." In soliciting public comment, CAB inquired:
 
 
 58
 Is the likelihood of passenger strandings great enough to outweigh the consumer benefits from relaxed group travel requirements, or is the problem illusory because the majority of charter passengers, will continue to travel in predictable group movements? If the problem is not illusory, what steps should the Board take to guard against it?[19]
 
 
 59
 43 Fed.Reg. at 11,219.
 
 
 60
 That CAB in one instance exhibited some uncertainty is not, however, dispositive. CAB in EDR-348 neither stated that carriers had no duty to return prepaid passengers, nor did it indicate that it was abandoning its long-held recognition of that duty. On the contrary, the quoted discussion is occasioned by CAB's expressed concern for avoiding passenger stranding.
 
 
 61
 Arrow points to a 1979 strike against World Airways (World). There was a "force majeure" clause in World's contract with the charter operator. CAB permitted World to collect from its passengers one-half an increased cost of the return flight. Order 79-8-72 (Aug. 14, 1979). That, says Arrow, shows a relationship between World and the charter operator, not between World and its passengers. The record shows, however, that CAB has always distinguished "impossibility" from nonpayment by the charter operator. See EDR-405, 45 Fed.Reg. 46,812 (July 11, 1980). Whether CAB correctly found an impossibility in the strike, or should have required World to pay passenger fares on other airlines, are questions not before us here. Nor can a single instance involving an impossibility and a CAB effort to protect passenger and carrier alike require a finding on this entire record that ER-1387 is substantive.
 
 
 62
 Nor can CAB's inartful language in EDR-348 and action in respect of World supplant Arrow's own experience with Secs. 207.13 and 208.32. Arrow was involved in the "Travex incident" in 1982, in which CAB stated:
 
 
 63
 We want to reiterate, however, the Board's interpretation of a direct air carrier's responsibility to passengers already overseas who have paid for round-trip charter air transportation. The Board's rules require that before a direct air carrier performs a charter flight, it must be paid for round-trip air transportation of the passengers involved. See section 208.32(e). We construe this to mean that any passenger that an air carrier enplanes on an outbound charter flight is entitled to receive return flight service. We understand that in the context of the instant program, Arrow performed outbound service for certain passengers who have paid for return transportation on staggered future dates. Since the carrier was required to collect in advance for the round-trip transportation of these passengers, it is Arrow's responsibility to insure that they receive return service. The carrier can fulfill this obligation either by providing the flights itself or arranging for transportation on other carriers, at no additional cost to the passengers.... [Emphasis added.]
 
 
 64
 Letter from John V. Coleman, Director, Bureau of Domestic Aviation, Civil Aeronautics Board, to Lawrence Wasko, Attorney, Arrow Air (August 4, 1982) (Joint Appendix at 70-71).
 
 
 65
 The 1982 Travex incident, and Arrow's notice of and acquiescence in CAB's position, were later recalled in the Legal Advisor's August 16, 1984 Memorandum quoted above, which also reiterated CAB's oft-repeated view that prepayment created a carrier's duty to return passengers. A CAB order issued in the case noted that the escrow bank had paid for return of passengers "although that was the primary responsibility of the air carrier." Order 83-2-102 (Feb. 24, 1983) (Joint Appendix at 250).
 
 
 66
 In conclusion, Arrow's arguments, plausible when standing alone, do not on balance overcome the evidence of record supporting ER-1387 as a duly issued interpretative rule. Though CAB's ER-1387 position had earlier surfaced intermittently in response to its changing charter regulations, no basis exists for holding ER-1387 to have been an exercise in substantive rulemaking.
 
 
 67
 Thus ER-1387 must on this record be seen as interpretive when measured under each of the "general principles" reprinted above from General Motors Corp. v. Ruckelshaus, 742 F.2d at 1565: CAB regarded the rule as interpretive; the rule clearly states what CAB thought its regulations meant, and serves primarily to remind Arrow and other carriers of a repeatedly articulated, pre-existing duty; CAB provided sufficient, reasoned analysis of its regulations, in light of the language, purpose, and legislative history surrounding the enactment of its regulatory powers; except for a single hesitancy, CAB's policy of protecting passengers against stranding has been consistently articulated and followed for a significant period of time (it was followed in relation to Arrow, which cannot logically claim surprise or change of position); and the administrative intent or practical impact of ER-1387 did not serve to create new law, rights, or duties.
 
 
 68
 (2) Reasonableness
 
 
 69
 A reviewing court must uphold an agency interpretation of the agency's own regulations if that interpretation be reasonable. See Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); British Caledonian Airways, Ltd. v. CAB, 584 F.2d 982, 995 (D.C.Cir.1978). Minor imperfections in the record are here insufficient to render an otherwise reasonable interpretation unreasonable. Because the record before us, read as a whole, indicates that CAB's interpretation is reasonable, we defer to the agency's policy analysis in interpreting its own regulation.
 
 
 70
 Saying that ER-1387 is not " 'sufficiently reasonable' to be accepted by a reviewing court," Federal Elections Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981), Arrow advances three bases for the argument:
 
 
 71
 (a) The requirement of "full payment of the total charter price, including payment for the return portion of a round trip," relates to payment for the out and back legs of an aircraft "rotation," not for "round trip" transportation;
 
 
 72
 (b) CAB's interpretation erroneously views advance payment to the carrier as creating a duty of carrier to passenger, when it merely creates a duty of charter operator to passenger;
 
 
 73
 (c) ER-1387 would impose an unreasonable burden on direct air carriers.
 
 
 74
 (a) "Round trip"
 
 
 75
 Despite the many arguments advanced, the "plain terms" of CAB's regulations offer no clear guidance on either of the competing definitions of "round trip" asserted by the parties.
 
 
 76
 14 C.F.R. Sec. 380.11 provides that "carrier(s) shall be [pre]paid in full for the cost of the charter transportation (for both legs, if a round trip charter)." The term "legs" might refer to legs of an aircraft rotation, as urged by Arrow, or to legs of a passenger's itinerary, as urged by the Secretary. Similarly, Sec. 307.13(b) provides that the "carrier shall require full [pre]payment of the total charter price, including payment for the return portion of a "round trip." Arguably, "return portion" might refer either to return of the aircraft or to return of the passenger.
 
 
 77
 In interpreting regulatory requirements, a court must search for a meaning consistent with the regulations' purpose. Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). CAB's reading complements the charter rules, and serves a fundamental purpose, that of protecting the funds and travel arrangement of passengers. Arrow's reading, sensible from its standpoint and more amenable to its preferred manner of doing business, is at odds with that purpose. CAB's elaborate prepayment and escrow provisions, 14 C.F.R. Secs. 380.34 and 207.17 suggest the passenger round trip as the basic definitional unit. Moreover, where, as here, two reasonable interpretations are possible, the agency's view must prevail. Chevron, U.S.A. v. National Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); Consumer Products Division, SCM Corp. v. Silver Reed America, Inc., 753 F.2d 1033, 1039 (Fed.Cir.1985).
 
 
 78
 (b) Duty of the carrier
 
 
 79
 It is undisputed that under CAB regulations, the charter operator must post a bond or deposit funds in an escrow account, and may receive its profit only after the carrier and others have been paid. The charter operator must deliver a detailed prospectus to CAB. The carrier must enter a "binding commitment" with the charter operator to furnish the contemplated air transportation, 14 C.F.R. Sec. 380.29, must require prepayment to its escrow bank or the posting of a bond, and can receive payment for each flight segment only after it has completed that segment.
 
 
 80
 Arrow argues that the "binding commitment" under Sec. 380.29 runs from the carrier only to the charter operator, and that a stranded passenger must look for remedy only to the charter operator.
 
 
 81
 To support that position, Arrow points to CAB's 1980 permission of "bulk fare" marketing schemes by scheduled carriers. CAB indicated that those schemes were acceptable because they were not "part charters," and noted that "[t]he real difference between the proposed ... program and charter service is [that] ... under charter service, the direct air carrier is without obligation if the charter operator defaults." Order 80-2-112 at 7 (Feb. 21, 1980) (Joint Appendix at 240).[3]
 
 
 82
 Arrow's argument is plausible, if "bulk fare" orders be read broadly. Equally plausible, however, is the Secretary's more narrow reading, i.e., that the carrier has no obligation (like that of scheduled airlines) to passengers before departure. That narrower reading does not conflict with CAB's long-standing position on stranding first articulated in SDR-740, in 1972, and does nothing to change the carrier's responsibility to return its passengers once it has accepted full payment and begun performance.
 
 
 83
 The Secretary proffers a picture of the regulatory scheme as mandating two tiers of consumer protection--one at the charter operator level, the other at the carrier level. Charter operators bear the most detailed responsibilities. The regulations prescribe in detail the form and content of disclosures to passengers, see 14 C.F.R. Sec. 380.30, terms of the contract with passengers, 14 C.F.R. Sec. 380.33, manner of prepayment, 14 C.F.R. Sec. 380.11, restrictions on cancellation, 14 C.F.R. Sec. 380.12, and security (surety bonds and escrows), 14 C.F.R. Sec. 380.34.
 
 
 84
 The second tier, the carrier, is required to verify that charter rules have been followed, see 14 C.F.R. Sec. 380.40, and to cosign the charter operator's depository agreement, 14 C.F.R. Sec. 380.34(b)(2), and statements appearing in the prospectus, 14 C.F.R. Sec. 380.28. The carrier's contract with the charter operator must, as above indicated, evidence a binding commitment to furnish air transportation, see 14 C.F.R. Sec. 380.29, must be so certified to the Secretary, 14 C.F.R. Sec. 380.28, and must cover and certify a defined flight schedule to the Secretary, security, and bank. Most important, however, the carrier must require payment for the charter (or posting of a sufficient bond) before commencing performance of the contract, see 14 C.F.R. Sec. 207.13. The carrier may not cancel a charter less than ten days before departure unless performance is physically impossible, see 14 C.F.R. Sec. 380.43. After performance, it must certify dates of departure and completion before receiving payment, see 14 C.F.R. Sec. 380.34, and must make similar certification to its own escrow bank, 14 C.F.R. Sec. 207.17. Any cancellation must be promptly reported to the Secretary, see 14 C.F.R. Sec. 380.15.
 
 
 85
 In view of that double tiered scheme, Sec. 207 et al. cannot reasonably be read to require prepayment only for rotation flights. Were that the case, passengers flown out would have paid full round trip fare, for only their outbound flight, the very problem against which Sec. 207 was directed. Acceptance of Arrow's willingness to wash its hands of stranded passengers would render meaningless the requirement in Sec. 380.29 that carriers enter a "binding commitment" to provide round trip transportation and thus to protect the traveller, who has already paid, against deprivation of that for which he or she has paid.
 
 
 86
 ER-1387 cites the escrow provisions in support of the same conclusion. The provision assuring each passenger's funds are released to the carrier only after that passenger's transportation has been completed can reasonably be read only as an effort to prevent the stranding of passengers with no way home and no available refunds if the charter operator defaults while that passenger is abroad. There would be no point to any anti-stranding provisions if the carrier were under no obligation to return stranded passengers after a charter operator defaults.
 
 
 87
 The Secretary's characterization of the regulations as establishing a "two-tiered system" of consumer protection is persuasive and supported by the regulations. Though the escrow provisions contain no explicit "anti-stranding" language, they are clearly consumer protection measures (the section title is "Protection of Customers' Deposits") and are correctly construed to protect more than the consumer's funds. The regulations permitting the carrier's bank to release funds to the carrier only on completion of a passenger's itinerary suggest that the basic payment unit contemplated by the regulatory scheme is the passenger itinerary, and that the regulations are clearly directed to consumer protection.
 
 
 88
 We find without merit Arrow's suggestion that ER-1387 is unreasonable because it will discourage low priced charter transportation. It is important to note that ER-1387 would permit carriers to enter rotation contracts "at their own risk." That warning clearly contemplates that the carriers contracting to fly rotation flights must return passengers who had prepaid the round trip fare.
 
 
 89
 The Secretary argues that implicit in the carrier's contractual duty to return passengers is a regulatory duty to return passengers, i.e., that Sec. 207's use of the contractual mechanism was merely an attempt to make that regulatory requirement self-enforcing. The Secretary points out that she could enforce either the contractual or regulatory duty citing, e.g., Order 83-2-102 (Joint Appendix at 250). We find it reasonable that the Secretary might regulatorily enforce the duties that arise from contract where, as here, the duty to contract is required under valid regulation.
 
 
 90
 (c) Unreasonable burden on carriers
 
 
 91
 Arrow argues that ER-1387 is unreasonable because it would impose: (1) accounting for bundles of passengers' itineraries; and (2) monetary losses.
 
 
 92
 The Secretary notes that in current regulations the carrier's bank is required to account separately for each "charter group"--or as here, each individual, 14 C.F.R. 207.17(a)(4), and the charter operator's bank is required to account for each "flight"--e.g., each bundle of individual return payments. 14 C.F.R. 380.34(b)(2)(vii). Thus, the banks, not the carriers, bear the burden of matching deposits and disbursements.
 
 
 93
 The real crux of this case is that, under the requirement expressly articulated in ER-1387, Arrow must return 4,700 passengers. It intimates to us that it will suffer a business loss. While adverse impact is a factor to be considered, it is not controlling. See American Postal Workers Union v. United States Postal Service, 707 F.2d at 558-59; British Caledonian Airways, Ltd. v. Civil Aeronautics Board, 584 F.2d at 991-92. Nor can a carrier's duty to return passengers be governed by the number that will be stranded if it fails in that duty. It is not unreasonable to preclude a carrier's transfer of its contract risk to the stranded passenger. If it cannot acceptably internalize that risk and keep its prices down, then it must raise its prices. Consumer protection costs money.
 
 
 94
 (3) Procedural Requirements
 
 
 95
 Because ER-1387 is a reasonable interpretative rule, the Secretary was not required to comply with 5 U.S.C. Sec. 553(b) and (c). Even interpretations must, however, offer a reasoned explanation, see Matlovich v. Secretary of the Air Force, 591 F.2d 852, 857 (D.C.Cir.1978), expressed "with sufficient clarity so that [the] decision[] may be readily understood." Kansas Gas & Elec. Co. v. FERC, 758 F.2d 713, 718 n. 8 (D.C.Cir.1985).
 
 
 96
 ER-1387 complies with that requirement. It identifies and quotes the provision interpreted, identifies what it regards as the main purpose of the regulations (to "provide protection" against "insolvency of the charter operator"), and clearly defines the obligation involved ("[e]ither by providing the flights itself or arranging for transportation"). Though CAB could over the years have better expressed the legal theories supporting its position,[4] the bottom line is clear: in view of "rules requir[ing] the direct carrier to be paid for both legs of a round-trip charter, for each passenger ... [the direct carrier] is then responsible for the return flight of every charter passenger for whom it has been paid." 49 Fed.Reg. at 33,436.
 
 
 97
 We find unavailing Arrow's argument that, even as an interpretation, ER-1387 should have addressed all relevant contentions in the docket of EDR-456. ER-1387 plainly addressed a sufficient number of the commentors' contentions for its purpose here. More to the point, however, is that ER-1387 is not EDR-456 and is not a substantive rulemaking to which the "hard look" doctrine applies. That a more complete explanation of the ambiguities and gaps in CAB's past statements might have been included is perhaps true, but irrelevant here.
 
 IV. CONCLUSION
 
 98
 For the reasons stated, we conclude that ER-1387 is interpretive and "simply state[s] what [CAB] thinks the statute means" and only "reminds affected parties of existing duties." General Motors Corp. v. Ruckelshaus, 742 F.2d at 1561. As the record graphically illustrates, CAB and its staff have been reminding Arrow and the industry of those duties for more than ten years. That CAB's statements could have been more explicit is not controlling; we are satisfied that the interpretation in ER-1387 is reasonable and properly founded on duly issued regulations.
 
 
 99
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 291(a) (1982)
 
 
 [1]
 CAB, the originally named respondent in this case, ceased to exist on January 1, 1985 by operation of the Federal Aviation Act of 1958, 49 U.S.C. Sec. 1301 et seq., as amended by the Airline Deregulation Act of 1978, 92 Stat. 1705, and the Civil Aeronautics Board Sunset Act of 1984, 98 Stat. 1703 (Sunset Act). Under section 12(e) of the Sunset Act, 49 U.S.C. Sec. 1556(e), a suit to which CAB is a party and relating to a transferred CAB function "shall be continued with the head of the federal agency to which the function is transferred." Accordingly, the Secretary of Transportation (Secretary) is substituted for CAB as respondent
 
 
 [2]
 Arrow also says ER-1387 "was adopted on an emergency basis for purposes of coercing Arrow." The record does not support that assertion
 
 
 [19]
 Eg., should the Board require the direct carrier operating an outbound charter flight to insure the return of those passengers at no extra charge in the event of failure or unauthorized cancellation by the charter operator
 
 
 [3]
 This court viewed that difference as sufficient to distinguish charter flights from scheduled flights. Transamerica Airlines, Inc. v. Civil Aeronautics Board, 661 F.2d 244, 249 (D.C.Cir.1981)
 
 
 [4]
 For instance, CAB never explained that the mandated contract between charter operator and direct air carrier must contemplate the passenger as a third-party beneficiary, or that restitution of the fare amount is not acceptable relief, or that a regulatory duty grows out of that contract